UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                Case No. 23-cr-20037

v.

                                    Hon. Jonathan J.C. Grey

HASSAN YEHIA CHOKR,

      Defendant.

_____/

## GOVERNMENT'S MOTION FOR A *SELL* HEARING

The United States of America, through undersigned counsel, respectfully requests a finding from the Court that substantial governmental interests are at stake in the prosecution of this case, followed by an evidentiary hearing to determine whether the defendant should be involuntarily medicated pursuant to *Sell v. United States*, 539 U.S. 166 (2002).

Pursuant to Local Rule 7.1, on October 4, 2024, the Government sought concurrence from defense counsel; it was denied.

*(signature on following page)*

Respectfully Submitted,

DAWN N. ISON
United States Attorney

*s/ Frances Lee Carlson*
FRANCES LEE CARLSON
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9696
frances.carlson@usdoj.gov
P62624

Dated: October 4, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,               Case No. 23-cr-20037

v.

                              Hon. Jonathan J.C. Grey

HASSAN YEHIA CHOKR,

        Defendant.

_____/

## GOVERNMENT'S BRIEF IN SUPPORT OF
## MOTION FOR A *SELL* HEARING

Defendant Hassan Chokr has been evaluated for competency at two different federal medical facilities, both of which have diagnosed him with "schizoaffective disorder, bipolar type" and "antisocial personality disorder." The psychologist that evaluated him for restoration opined that medication can restore the defendant to competency. But so far, Chokr has refused to take medication that would aid in the restoration of his competency. The doctors at the Federal Medical Center in Butner, North Carolina therefore request court-ordered treatment with psychotropic medication on an involuntary basis. The government agrees. The important governmental interests at stake here (especially bringing Chokr to trial for possessing and attempting to purchase firearms after leaving a synagogue where he issued anti-Semitic threats), coupled with the medical necessity and appropriateness of the proposed antipsychotic medication regimen support the government's request

3

that the Court order Chokr to be involuntarily medicated. *See Sell v. United States*, 539 U.S. 166 (2003). If the Court determines that there are important governmental interests at stake, then it should hold an evidentiary hearing to determine whether forcible medication will significantly further those interests, and that medication is necessary and medically appropriate. *Id.*

## I.   Factual Background

On the morning of December 2, 2022, Chokr went to Temple Beth El in Bloomfield Hills, Michigan. He slowly drove through the parking lot yelling racist and anti-Semitic profanities and threats at parents as they walked their children into the day care center. As one mother walked her daughters through the parking lot, Chokr yelled, "Do you support Israel . . . How dare you . . . You are going to pay . . . Fuck Israel and Jews!" He repeatedly called an African American security guard the "N" word for "protecting the Jews" and threatened to get out of his car. The security guard heard Chokr threaten, "Y'all are going to die!"

Not long after Chokr left Temple Beth El, he went to a gun store in Dearborn. There, Chokr handled six different firearms including an assault rifle and a machine gun. He held each firearm in his hands, and at times pointed it and pretended to pull the trigger.

4



*Fig. 1: Chokr pointing a semi-automatic handgun.*



*Fig. 2: Chokr handling an AR15-style assault rifle.*



*Fig. 3: Chokr handling a Mac-10 machine gun.*



*Fig. 4: Chokr pointing a 12-gauge shotgun.*





*Fig. 5: Chokr handling a pump-action shotgun*          *Fig. 6: Chokr pointing an AK47-style assault rifle.*

Chokr ultimately decided to purchase the semi-automatic handgun, AR-15 assault rifle, and pump-action shotgun. (Figs. 1, 2, and 4, above). In completing the required ATF Form 4473, Chokr answered "No" to several questions that would determine his eligibility to receive or possess a firearm. Specifically, he lied by indicating that he was not under information in any court for a felony, that he had never been convicted of a felony, and that he had never been committed to a mental institution. In truth, Chokr was pending trial for felonious assault and assaulting, resisting, and obstructing a police officer in Wayne County Third Circuit Court. He also was convicted of a felony offense in September 2017. Finally, Chokr

6

previously was committed to a mental institution under a mental health order issued by the Wayne County Probate Court.

While waiting for the results of the background check, Chokr stated, "It ain't a fair fight out here. I'm going to even the score. I'm going to even the playing field real soon brothers, real soon." (Ex. A, Dearborn PD Report (redacted) at 4; ECF No. 13, PageID.41). A witness at the gun store also heard Chokr say he would use the guns for "God's wrath." (Ex. A at 4). Fortunately, Chokr was denied the purchase after a background check but this enraged him. After leaving the gun store, he posted several statements threatening violence in reaction to being denied the purchase of the firearms. Chokr expressed his anger on these Instagram posts:


*Fig. 7*


*Fig. 8*

Chokr also posted a video on Instagram about being denied and talked about "ripping people apart limb by limb." *Id.*

## II.    Relevant Procedural Background

On December 15, 2022, Chokr was charged in a criminal complaint with providing a false statement during the attempted acquisition of a firearm. (ECF No. 1). At the time, Chokr was in state custody pending charges in Oakland County of ethnic intimidation based on his conduct at Temple Beth El. On January 3, 2023, Chokr appeared on the complaint here pursuant to a writ of habeas corpus *ad prosequendum* and was temporarily detained. (ECF No. 8). Following an extensive detention hearing, on January 12, 2023, the Court ordered the defendant detained pending trial. (ECF No. 21). On January 18, 2023, a federal grand jury returned an indictment against Chokr, charging him with the false statement offense as well as being a felon in possession of a firearm. (ECF No. 18).

In the Oakland County case, on defense counsel's motion, the court ordered the defendant to undergo a competency examination. In this case, based on the stipulation of the parties, the Court also found that there was reasonable cause to believe that the defendant may not be competent to stand trial. (ECF No. 25). Originally, the Court ordered that the examination already being conducted by the state could be used for competency proceedings in this case. (*Id.*). While the state evaluator ultimately found the defendant not competent to stand trial but with the possibility of being restored with appropriate treatment, the government moved for a second examination to be conducted by the Bureau of Prisons (BOP) because the

state forensic report was deficient under 18 U.S.C § 4247(c). The Court agreed and ordered Chokr to undergo a second competency evaluation to be conducted by the BOP. (ECF No. 37).

Chokr was designated to the Metropolitan Correctional Center Chicago for his competency evaluation. As documented in the forensic evaluation report, BOP psychologist Kristin Conlon diagnosed Chokr with Schizoaffective Disorder–Bipolar Type, Antisocial Personality Disorder, and Unspecified Other Substance-Related Disorder. (MCC Chicago Report at 10). Dr. Conlon opined that Chokr was not competent to stand trial but there was a probability that his competency could be restored with a competency restoration program that would include education and psychiatric medication. (MCC Chicago Report at 14). Based on Dr. Conlon's report, which the parties agreed the Court should adopt, on October 31, 2023, the Court found that Chokr was not competent to stand trial and committed him to the custody of the Attorney General for placement in a suitable facility to restore him to competency or determine if his competency was likely to be restored in the foreseeable future. (ECF No. 39).

Chokr was placed at the Federal Medical Facility in Butner, North Carolina on May 14, 2014. The Warden of that facility notified the Court by letter of Chokr's admission and also calculated the evaluation period to end on September 10, 2024. *See* 5/17/2024 Ltr. From Warden T. Scarantino.

On September 17, 2024, the forensic evaluation report completed by Butner psychologist Evan S. Du Bois was submitted to the Court. Dr. Du Bois also diagnosed Chokr with Schizoaffective disorder–Bipolar Type and Antisocial Personality Disorder. (Butner Report at 8). Dr. Du Bois indicated that Chokr's schizoaffective disorder continues to render him not competent to stand trial although he could be restored to competency with the appropriate medication regimen. (Butner Report at 12). But during the initial restoration period, Chokr refused to take such medication while at FMC Butner. (Butner Report at 5, 6). The report states that the primary treatment for Chokr's mental illness is antipsychotic medication and without it, his symptoms are likely to persist and even worsen. (Butner Report at 9). The report concludes by recommending court-ordered involuntary treatment with psychotropic medication should the Court determine that additional restoration efforts would be appropriate after analysis of the factors established in *Sell v. United States*. (Butner Report at 12–13).

## III. The *Sell* Analysis

In *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court considered whether an incompetent defendant who was not a danger to himself or others could be involuntarily medicated to restore that defendant to competence so he could stand trial. The Court concluded "that the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing

serious criminal charges in order to render that defendant competent to stand trial."
*Sell*, 529 U.S. at 179. The Court then identified four findings a trial court must
make before ordering involuntary medication: (1) that "*important* government
interests are at stake;" (2) that involuntary medication will *significantly further*
those concomitant state interests; (3) that involuntary medication is *necessary* to
further the government interests; and (4) that the administration of drugs is
*medically appropriate* (i.e., in the patient's best medical interests in light of his
medical condition)." *Id*. at 180–81 (emphasis in original). The government must
establish each of the four factors by clear and convincing evidence. *United States v.
Payne*, 539 F.3d 505, 508–09 (6th Cir. 2008). The first factor is a legal question and
the remaining three involve factual findings. *United States v. Grigsby*, 712 F.3d
964, 969 (6th Cir. 2013). The *Sell* factors are addressed in turn, but the Government
requests an evidentiary hearing as to the three factors that require the Court to make
factual findings.

### A.   First *Sell* Factor: Important governmental interests are at stake.

In discussing the first *Sell* factor, the Supreme Court stated:

> The Government's interest in bringing to trial an individual accused of
> a serious crime is important. That is so whether the offense is a serious
> crime against the person or a serious crime against property. In both
> instances the Government seeks to protect through application of the
> criminal law the basis human need for security.

*Id.* at 180.

### 1.  Chokr is charged with a serious crime.

The Supreme Court in *Sell* did not define what constitutes a "serious crime." However the Sixth Circuit has identified "the maximum statutory penalty" as "the most objective means of determining the seriousness of a crime." *United States v. Green*, 532 F.3d 538, 549 (2008). Here, the indictment charges Chokr with felon in possession of a firearm, which carries a potential 15-year prison sentence, and making a false statement during the attempted acquisition of a firearm, which carries a potential 10-year prison sentence. Courts have found this first *Sell* factor met in cases that involved crimes carrying lengthy potential terms of incarceration like the ones that Chokr faces. *See, e.g. United States v. Grigsby*, 712 F.3d 964, 969 (6th Cir. 2013) (unarmed bank robbery with a potential penalty of 20 years in prison); *United States v. Berry*, 911 F.3d 354, 361 (6th Cir. 2018) (referencing cases from other circuits and suggesting that a crime with a potential 10-year sentence would be a serious crime under *Sell*); *United States v. Evans*, 404 F.2d 227 (4th Cir. 2005) (threatening to murder a federal judge carrying a 10 year statutory maximum penalty); *United States v. Duncan*, 224 F. Supp. 3d 580, 584 (W.D. Ky. 2016) (finding an offense carrying a maximum sentence of 10 years in prison to be "serious" as it relates to the first *Sell* factor); *United States v. Sturgill*, 2020 WL 2124592, at *5 (E.D. Ky. 2020) (concluding that "under Sixth Circuit precedent, a

crime with a statutory maximum of ten years imprisonment can be considered a serious crime).

Based on the statutory maximum penalties that Chokr faces, there is clear and convincing evidence that the government has an important interest in prosecuting this case.

## 2.  Mitigating circumstances do not lessen the government's interests.

In addition to considering whether the defendant is charged with a serious crime, the Court also must consider whether there are any "mitigating circumstances that significantly undercut the government interest in prosecuting" the defendant. *Berry*, 911 F.3d at 362. The *Berry* court identified several potential mitigating circumstances to consider: (1) the length of the defendant's pretrial confinement; (2) the nature of the defendant's alleged crime; (3) the risk that the defendant will harm himself or others; and (4) the likelihood that the defendant will be civilly committed. *Id.* These mitigating circumstances will be addressed in turn.[1]

_____

[1] Courts have also considered a defendant's capacity at the time of the offense as a potential mitigating circumstance. If a defendant is eventually restored to competency, the likelihood that "he will be found not guilty . . . by reason of insanity greatly tempers the government's interest in prosecution." *United States v. Grigsby*, 712 F.3d 964, 969 (6th Cir. 2013). Here, Chokr has not filed notice of an insanity defense pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure, nor has any expert evaluated Chokr as to his mental condition at the time of the offense or opined about it. This is not a factor that can diminish the government's interest based on the record before the Court.

### a.  Chokr's pretrial detention does not diminish the Government's interest in prosecuting him.

In considering whether the government's interest in prosecuting a defendant is diminished by the amount of time he has spent in pretrial custody, Sixth Circuit precedent focuses on the guideline range under the United States Sentencing Guidelines. *See Grigsby*, 712 F.3d at 973 ("To consider only the statutory maximum penalty when conducting this portion of the *Sell* analysis would not be consistent with Supreme Court precedent after *United States v. Booker.*") (*Booker* citation omitted).

Here, Chokr's potential sentencing guideline range is 46–57 months. This range is based on a base offense level under U.S.S.G. § 2K2.1(A)(4)(B)(i)(I) of 20 and a two-level increase under § 2K2.1(b)(1)(A) because the offense involved 3–7 firearms. Chokr has two prior convictions, one for stealing/retaining a financial transaction device without consent and the other for attempted animal cruelty, which results in two criminal history points and a criminal history category of II.

Although Chokr was ordered detained in this case, he will likely not receive credit towards his federal sentence for the time he has spent thus far in pretrial detention. Throughout the pendency of this case Chokr has been in the primary custody of the Oakland County Sheriff's Department, appearing as needed by writ. (*See* ECF Nos. 3, 9, 20, 34 ). Thus, it is likely that Chokr will only receive credit towards his state sentence for the time he has been in pretrial custody. *See* 18

14

U.S.C. § 3585(b) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . that has not been credited against another sentence."); *United States v. Wilson*, 503 U.S. 329, 337 (1992) (a defendant cannot get double credit for a single span of time against both a state and a federal sentence).

Even so, in Oakland County, Chokr was charged with ethnic intimidation, which carries a maximum sentence of two years. *See* MCL 750.147b. The judge there set a $1,000,000 bond and Chokr has been detained in that case since December 5, 2022. This means that Chokr will have served the statutory maximum penalty in the Oakland County case, after which any time spent in pretrial detention should count towards his federal sentence.

Thus, Chokr will have served little, if any, of his guideline range by the time the Court decides whether to have him involuntarily medicated to restore his competency. And, even if he ends up getting credit towards his federal sentence for all of the time spent thus far in pretrial detention, he still would have time left to serve upon conviction based upon the 46–57 month guideline range. While it certainly will then take an additional period of time for Chokr to be medicated before he is restored to competency, tried, and sentenced (assuming he is convicted at trial), it is unlikely that this period of time will extend beyond the 46–57 months

guideline range. So, Chokr's time spent thus far in pretrial detention does not undercut the Government's interest in prosecuting him.

But even if Chokr would have served much of the time called for by the Guidelines does not necessarily eliminate the Government's interest in taking the matter to trial because the prosecution serves purposes beyond the incapacitation of Chokr. For example, "prosecution of the instant offenses expresses society's disapproval of such conduct and potentially deters others from engaging in it." *United States v. Gutierrez*, 704 F.3d 442, 451 (5th Cir. 2013). And for a mentally ill individual like Chokr, a period of supervised release is important for his integration into society and for the protection of society. Supervised release requires a conviction, thus furthering the Government's interest in prosecuting this case. *See United States v. Bush*, 585 F.3d 806, 814–15 (4th Cir. 2009) (ruling that the first *Sell* factor was satisfied and case did not involve special circumstances that undercut governmental interest in medication even though defendant had already served significant time in custody; noting that possibility of supervised release and associated restrictions on defendant's post-release activities were considerations); *but see United States v. White*, 620 F.2d 401, 413-14 (4th Cir. 2010) (ruling that special circumstances undercut governmental interest in medication because defendant had already been confined for more time than the expected sentence). Here, Chokr faces up to three years of supervised release if convicted, *see* 18 U.S.C.

16

§ 3583(b), and a special condition of his supervised release could require him to continue taking his medication. This period of supervision after his term of imprisonment further substantiates the governmental interest in this case.

### b.  The Nature of Chokr's Alleged Crimes

The nature of the charged crimes also do not diminish the governmental interest in this prosecution—in fact, quite the opposite. Chokr is charged with possessing six different firearms and attempting to purchase a semi-automatic handgun, AR-15 assault rifle, and pump-action handgun by lying that he was not a prohibited person. When he was in the gun store shopping for various high-powered rifles and shotguns, a machine gun, and firearms, Chokr indicated that he would use the guns for "God's wrath" and that he would "even the playing field real soon[.]" (Ex. A, Dearborn PD Report (redacted) at 4; ECF No. 13, PageID.41). After being denied the purchase of the firearms, Chokr became irate and began yelling that he would "tunnel through the drywall and get his guns." (Ex. A at 4). After leaving the gun store, he posted several statements threatening violence in reaction to being denied the purchase of the firearms. Chokr posted a video on Instagram about being denied and talked about "ripping people apart limb by limb." (*Id.).* He also posted on Instagram, "You won't take me Alive mother fuckers[s]", and "Time to bust out the drywall. Ouzzie time[.]" along with a picture of the denial slip. (*Id.).* Of note,

prior to attempting to purchase the firearms, Chokr had just come from threatening to kill Jewish parents and children at a local synagogue.

Accordingly, the nature of Chokr's crimes—that he possessed and attempted to purchase firearms for "God's wrath" and to "even the playing field"— substantiates, not mitigates, the government's interest in prosecuting this case.

### c.  The Risk that Chokr will harm himself or others

The Court can also consider as a mitigating circumstance the risk that Chokr will harm himself or others if he is not medicated. *Berry*, 911 F.3d at 364–65. The Government recognizes that according to the evaluating psychologist, Chokr has been housed on a general population mental health unit at Butner without incident. (Butner Report at 12). He has not attempted to harm himself or others despite the fact that he has thus far refused medication. (*Id.*). Although this factor weighs against the Government's interest in prosecuting him, it does not alone overcome the seriousness of his crimes. *See Berry,* 911 F.3d at 366 (noting that "[n]o factor on its own outweighs the governmental interest").

### d.  The likelihood that Chokr will be civilly committed

Under 18 U.S.C. § 4246, if Chokr were not restored to competency, he could be civilly committed only if a court finds by clear and convincing evidence that he "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious

damage to property of another[.]" But the Government's interest in prosecuting this case is not diminished if the likelihood of civil commitment is uncertain, as it is here. *See United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013) (possibility of civil commitment did not diminish the government's important interest where it was unclear whether the defendant would meet the statutory requirements for civil commitment).

On September 27, 2024, the U.S. Attorney for the Eastern District of North Carolina, where FMC Butner is located, filed a Certificate of Mental Disease or Defect and Dangerousness against the defendant as well as a motion to hold the civil commitment case in abeyance pending the resolution of Chokr's competency and restorability in this case. *See United States v. Hassan Yehia Chokr*, No. 5:24-HC-2175, ECF Nos. 1, 5 (E.D. N.C., Sept. 27, 2024). The Government understands that the Supreme Court listed the likelihood of civil commitment as a special circumstance because "that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180; *see also Grigsby*, 712 F.3d at 970–71. But the government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain. *United States v. Sherill*, 834 Fed. Appx. 223 230 (6th Cir. 2020); *Gutierrez*, 704 F.3d at 450. Here, the Court should not consider the fact of the certificate filing as a mitigating circumstance weighing against forced medication. The mere filing of a certificate of

dangerousness does not mean that the defendant's civil commitment is certain. In fact, the U.S. Attorney for the Eastern District of North Carolina proactively seeks to protect its jurisdiction to engage in commitment proceedings because of a recent Fourth Circuit case, *United States v. Wayda*, 966 F.3d 294 (4th Cir. 2020).  In *Wayda,* the Fourth Circuit ruled that the government loses civil commitment jurisdiction over a defendant if the certificate of dangerousness is not timely filed while the Attorney General still has custody of the defendant. Fourth Circuit jurisprudence is in stark contrast to other Circuit law. *See Sealed v. Sealed*, 802 Fed. Appx. 138, 142 (5th Cir. 2020) ("Thus, the statute contemplates that the § 4246 proceedings occur after the expiration of the time period in § 4241(d)). Consequently, the U.S. Attorney's prophylactic action in filing a certificate of dangerousness to preserve jurisdiction should not be taken as a "certainty" that the defendant will be civilly committed for purposes of *Sell.* The government further points out that this Court will not be a party to any civil commitment proceedings because the defendant was hospitalized in the Eastern District of North Carolina, not the Eastern District of Michigan.

At this point, BOP has only conducted a threshold assessment of Chokr's dangerousness. The District Court in North Carolina would certainly order a full evaluation pursuant to 18 U.S.C. § 4246(b) prior to the civil commitment hearing there. Without that risk assessment, which is distinct from the evaluation for

competency, whether Chokr is a candidate for civil commitment is uncertain at best and does not undercut the government's interest in this case.

### B.   The Remaining *Sell* Factors

The second, third, and fourth *Sell* factors require an evaluation of psychological probabilities based on the proposed treatment plan and the Chokr's diagnosis. The second *Sell* factor asks the Court to find "that involuntary medication will *significantly further*" the concomitant state interests. *Sell*, 539 U.S. at 181. The Court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* The third *Sell* factor is "that involuntary medication is *necessary* to further the government interests." *Id.* Under this factor, the Court must find that any "alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.* The fourth and final *Sell* factor requires "that the administration of drugs is *medically appropriate*. (i.e., in the patient's best medical interests in light of his medical condition)." *Id*. at 181. The Supreme Court noted that "the specific kind of drugs at issue may matter here." *Id.*

Should this Court find that a substantial governmental interest is at stake, an evidentiary hearing on the remaining *Sell* factors should be held. At that hearing, doctors will testify about Chokr's specific medical condition, the appropriateness of the proposed medication, the likelihood of success of such medications, their side effects, and any alternative treatments that do not involved involuntarily administered medication. Following the hearing, if it would be helpful to the Court, the Government requests the opportunity for further briefing regarding these remaining *Sell* factors.

## IV.  Conclusion

The Government has demonstrated an important governmental interest in involuntarily medicating Chokr. The Court should find as much, and then order an evidentiary hearing where the BOP psychologist and psychiatrist can testify and provide opinions regarding the remaining *Sell* factors.

Respectfully Submitted,

DAWN N. ISON
United States Attorney

*s/ Frances Lee Carlson*
FRANCES LEE CARLSON
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9696
frances.carlson@usdoj.gov
P62624

Dated: October 4, 2024

## <u>CERTIFICATE OF SERVICE</u>

I certify that on Friday, October 04, 2024, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to the attorneys of record.

Nabih H. Ayad
filing@ayadlawpllc.com

s/ *Frances Lee Carlson*
FRANCES LEE CARLSON
Assistant United States Attorney